439 F.2d 743
 UNITED STATES of America, Appellee,
v.
Lee WEINBERG, Appellant.
UNITED STATES of America, Appellee,
v.
David Alfred SCHEFFLER, Appellant.
UNITED STATES of America, Appellee,
v.
Teri Ann VOLPIN, Appellant.
UNITED STATES of America, Appellee,
v.
Karen DUNCAN, Appellant.
UNITED STATES of America, Appellee,
v.
Pamela DONALDSON, Appellant.
 No. 26903.
 Misc. Nos. 5484-5487.
 United States Court of Appeals, Ninth Circuit.
 January 18, 1971.
 
 Kenneth Cloke, Barrett Litt, John M. Pratt, H. Peter Young, Venice, Cal., for appellants.
 Richard K. Burke, U. S. Atty., John Wilkes, Asst. U. S. Atty, Tucson, Ariz., for appellee.
 Before CHAMBERS, HAMLEY and HUFSTEDLER, Circuit Judges.
 HAMLEY, Circuit Judge:
 
 
 1
 In the fall of 1970 a grand jury was convened at Tucson, Arizona to inquire into the matters referred to in the margin.[1] The five appellants were subpoenaed by the United States to testify before the grand jury. Each refused to answer most of the questions asked of them before the grand jury. Each was then called before a district judge then sitting in Tucson, granted immunity pursuant to 18 U.S.C. § 2514, and ordered to "testify and answer the questions asked by the grand jury."
 
 
 2
 Each of the appellants was then returned to the grand jury room and the United States Attorney asked each of them substantially the same questions as on their first appearances before that body. Each appellant was permitted, if he or she wished, to leave the jury room and confer with his or her attorney in the corridor. Some of the appellants followed this course after almost every question; others followed this course sparingly.
 
 
 3
 All refused to answer almost all of the questions asked of them. While there was some variation in the reasons given for refusing to answer, the reasons most frequently stated were that such refusal was pursuant to the witnesses' constitutional rights under the First, Fourth, Fifth, Sixth and Ninth Amendments, the right to privacy; and because the questions were vague, broad, compound and irrelevant.
 
 
 4
 Immediately after each refused to answer questions this second time, the witness was ordered to show cause at once, in district court, why he or she should not be adjudged and held in civil contempt.[2] Hearings were immediately held, appellants' motions for continuances being in each case denied. At each hearing, the court reporter who took down the grand jury proceedings was called to testify concerning the questions asked and the responses received.
 
 
 5
 After the reporter testified concerning six to twelve of the questions and responses, the district court terminated his testimony. Each appellant personally, or through counsel, made it clear that he or she would continue to refuse to answer these questions. Counsel for appellants then presented oral argument in support of the various reasons why appellants had declined to answer the questions. In general, the district court declined to rule upon the various objections, holding that the grant of immunity foreclosed the only objection which appellants could properly advance at that time. In each case the district court then adjudicated the witness to be in civil contempt and ordered his or her immediate commitment. These decrees and commitments are summarized below.[3]
 
 
 6
 Each of the appellants appealed and we have consolidated the appeals for purposes of briefing and disposition. By order of this court entered on January 5, 1971, we expedited the appeals in order that they may be disposed of within thirty days from the filing of such appeal, as required by 28 U.S.C. § 1826(b). Appellants' motion for reconsideration of the order of January 5, 1971, insofar as it expedites the appeal, is denied. Appellants' motion for leave to file a supplement to the opening brief in lieu of a reply brief, is granted, and their supplemental brief has been received and considered.
 
 
 7
 All of the appellants argue that they were deprived of the notice and hearing requirements of the Due Process Clause of the Fifth Amendment, when the individual civil contempt proceedings were conducted immediately after the respective appellants had refused to obey the court's order to testify.
 
 
 8
 Under the circumstances of this case, as described above, we believe each appellant, and his or her attorney, had ample notice that contempt proceedings would be held in the event of refusal to answer the questions, and ample notice of the issues which would be relevant thereto. While there was practically no advance notice of the time of the several contempt hearings, the record indicates that counsel were able to, and did present, vigorously and in some detail, the principal arguments which they renew on this appeal.
 
 
 9
 Under all of the circumstances we hold that appellants were not deprived of due process with regard to these contempt proceedings. See Licata v. United States, 429 F.2d 1177, 1180 (9th Cir. 1970), vacated as moot, 400 U. S. 938, 91 S.Ct. 239, 27 L.Ed.2d 243.[4] The same considerations which justify the holding of civil contempt proceedings, absent the safeguards of indictment and jury (Shillitani v. United States, 384 U.S. 364, 371, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966)), warrant reasonable expedition of such proceedings both in the district court and on appeal.
 
 
 10
 All of the appellants assert that they were deprived of their rights under the Due Process Clause and Rule 6(d), Federal Rules of Civil Procedure, because they were not given adequate notice of the proceedings during which they were granted immunity and ordered to testify, and were thus deprived of a full and fair hearing.
 
 
 11
 At these hearings, which preceded the contempt hearings, the Government asked that appellants be granted immunity under 18 U.S.C. § 2514, and that, after such immunity were granted, that they be ordered to answer, before the grand jury, the questions propounded to them. Both requests were granted by the court.
 
 
 12
 The leading case prescribing the procedure to be followed in proceedings under 18 U.S.C. § 2514 for the granting of immunity and the directing of a witness to answer questions before the grand jury, is In re Bart, 113 U.S.App.D.C. 54, 304 F.2d 631 (1962). As there indicated, while such a proceeding is by its nature preliminary and summary, an application by the Government for such relief, and supporting documents, should normally be served in accordance with the Federal Rules of Civil Procedure.
 
 
 13
 Rule 6(d) provides for five days notice, which was not given here. But Rule 6(d) also provides that a different period may be fixed by the court. In effect, that is what happened here; the district court denied appellants' motion for a continuance and ordered that the section 2514 proceeding be had almost immediately after the respective appellants had refused to testify before the grand jury.
 
 
 14
 Under the circumstances of this case, we do not believe that appellants were prejudiced by the expedition thus ordered. They could not have been prejudiced by the grant of immunity because such a grant is for the benefit of the witness. As for the direction to testify, the issues appropriate for consideration in a section 2514 proceeding are exceedingly limited, as pointed out in In re Bart. Examination of the record indicates that counsel were prepared for, and did, make a vigorous presentation on these issues, and on many other issues which were irrelevant or premature. We conclude that the section 2514 procedures did not infringe upon appellants' due process rights, or their rights under the Federal Rules of Civil Procedure.
 
 
 15
 All of the appellants contend that the district court violated their rights under the First Amendment by refusing to inquire into the constitutional propriety of grand jury questions delving into appellants' political beliefs, conversations and associations and into political meetings, assemblies and activities in which they participated.
 
 
 16
 In presenting argument on this question, appellants urge: (1) the questions they refused to answer impinged upon their rights under the First Amendment and (2) assuming that some or all of such questions were proper under the First Amendment, and consistent with the right of privacy, the district court should at least have so determined, in advance of appellants' last appearance before the grand jury, so that they would then have known what was being required of them.
 
 
 17
 Turning to the first problem we must, at the outset, limit our inquiry to the questions generally similar to those which were propounded, as testified to by the court reporter, when the individual appellants were returned to the district court on the orders to show cause why they should not be held in contempt. This is necessary because the contempt adjudication and commitments were referenced to the refusal to answer questions testified to by the reporter, and generally similar questions. If questions not generally similar to those testified to by the reporter were asked at appellants' last grand jury appearance, we do not know what they were or why appellants refused to answer them, and in any event, appellants have not been penalized for refusing to answer them.
 
 
 18
 Of the questions testified to at the district court proceedings, only a few seem to fall in the general area relevant to the contention now under discussion. We summarize them in the margin.[5]
 
 
 19
 This court recently recognized the right of a newspaper reporter, on First Amendment grounds, to refuse to answer questions pertaining to the sources of information he used in his news reporting, and his right to refuse to appear before the grand jury to submit to such questioning. Caldwell v. United States, 434 F.2d 1081 (9th Cir. 1970).
 
 
 20
 It will be noted, however, that Caldwell sought, and was granted, safeguards for the future exercise of the First Amendment right of free press, and was not complaining that his First Amendment rights had been infringed in the past. Likewise, appellants' only possible First Amendment complaint must be with reference to the chilling effect the grand jury questions will have on the future exercise of their rights under that Amendment. They may, and do, argue however, that the asking of these questions interfered with their right of privacy concerning past acts and conduct. This contention seems to be more related to the Due Process Clause of the Fifth Amendment than to the First Amendment.
 
 
 21
 Apart from unusual circumstances, such as those involved in Caldwell, the chilling effect such questions may have upon the future exercise of First Amendment rights, or the asserted deprivation of privacy with regard to past acts and conduct are not, we believe, a recognized ground for lawful refusal to answer questions propounded before a grand jury.
 
 
 22
 What Judge, now Mr. Justice Stewart, said in Garland v. Torre, 259 F.2d 545, 549 (2d Cir. 1958), concerning the obligation of a witness to testify and the correlative right of a litigant to enlist judicial compulsion of testimony in private litigation, is as much or more applicable in federal grand jury proceedings than in civil litigation. Noting that such compulsion is a recognized incident of judicial power of the United States, Judge Stewart said:
 
 
 23
 "Without question, the exaction of this duty impinges sometimes, if not always, upon the First Amendment freedoms of the witness. Material sacrifice and the invasion of personal privacy are implicit in its performance. The freedom to choose whether to speak or be silent disappears. But `[t]he personal sacrifice involved is a part of the necessary contribution of the individual to the welfare of the public.' Blair v. United States, supra, 250 U.S. [273] at page 281, 39 S.Ct. [468] at page 471 [63 L.Ed. 979]."
 
 
 24
 We turn, then, to the argument that even if some or all of such questions were proper under the First Amendment, and consistent with the right of privacy, the district court should at least have so determined in advance of appellants' last appearance before the grand jury, so that they would then have known what was being required of them.
 
 
 25
 The record indicates that, before their last appearance before the grand jury, appellants were aware that all objections except those pertaining to self-incrimination had been rejected by the district court.[6] It was not necessary for the court to consider, in advance, each individual question which would be asked, and to rule on whether it would have a chilling effect upon the future exercise of First Amendment rights, or interfere with appellants' right of privacy as to past acts and conduct.
 
 
 26
 Such a procedure would constitute a serious interference with the normal course of grand jury proceedings, and the secrecy thereof. We have noted above the limited scope of proceedings for the granting of immunity and the directing of witnesses to answer questions before the grand jury, as spelled out in In re Bart, 304 F.2d 631, 636-637 (D.C.Cir. 1962).
 
 
 27
 All of the appellants urge that, in refusing to inquire into the constitutional propriety of grand jury questions delving into conversations, meetings, associations, assemblies and other activities in which appellants say they were reasonably expected to enjoy privacy from unreasonable governmental intrusion, the district court violated their Fourth Amendment rights.
 
 
 28
 The Fourth Amendment is usually thought of as extending to searches for, and seizures of, tangible items. However, as made clear in Katz v. United States, 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), it extends also to the recording of illegally overheard oral statements. But compelled grand jury testimony is neither a search for, nor seizure of, oral statements in the sense envisioned by the Fourth Amendment. As Judge Zirpoli said in In re Grand Jury Witnesses Sherrie Bursey and Brenda Joyce Presley, 322 F.Supp. 573 (N.D.Cal.1970):
 
 
 29
 "The grand jury does not need to have probable cause to investigate; rather its function is to determine if probable cause exists. And if probable cause is not required to investigate, it follows that probable cause is not required to make the preliminary showing necessary to call a witness whose testimony may shed light on criminal activity which the grand jury must investigate if the national interest is to be effectively served."
 
 
 30
 "Only the grand jury can properly decide what may be useful to such an investigation, and if it has any meaningful role to play, this is a function it must have free from undue interference of the Court."
 
 
 31
 With regard to their Fourth Amendment argument, appellants rely upon Boyd v. United States, 116 U.S. 616, 622, 6 S.Ct. 524, 29 L.Ed. 746 (1886). But what the Court there said was that a compulsory production of a man's private papers "* * * to establish a criminal charge against him, or to forfeit his property * * *" is within the scope of the Fourth Amendment. That was not the purpose of the questions asked of appellants before the grand jury.
 
 
 32
 Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 208, 66 S.Ct. 494, 90 L.Ed. 614 (1946), also relied upon by appellants, likewise involved a subpoena duces tecum to produce records and papers. The Court said that "* * * the Fourth, if applicable, at the most guards against abuse only by way of too much indefiniteness or breadth in the things required to be `particularly described' * * *" in the subpoena.
 
 
 33
 All of the appellants argue that their commitments for contempt violated the Due Process Clause because the grand jury questions were so vague, broad and irrelevant that they were not given a fair opportunity to determine, at the peril of contempt, whether they were entitled to refuse to answer the questions.
 
 
 34
 In our opinion, none of the questions concerning which the court reporter gave testimony in the contempt proceedings are vague. Some of them were broad and compound. Had any appellant told the United States Attorney that he would try to answer such a question if it were simplified or propounded in parts, there would be a basis for complaint. But the appellants made no such requests and uniformly indicated, in effect, that they would not answer the questions no matter how simple. Indeed, several of the questions appellants refused to answer, as testified to by the court reporter, were exceedingly simple.[7] No appellant refused to answer on the ground that he or she did not remember.
 
 
 35
 The complaint that some of the questions were irrelevant brings into question the subject matter of the grand jury investigation. The general nature of the investigation was necessarily made known by the Government when it applied for grants of immunity. Any further delving into this area would have interfered with the secrecy in which grand jury proceedings have traditionally been held. See United States v. Harris, 334 F.2d 460, 462 (2d Cir. 1964). However pertinent the question of relevancy may be with regard to questions asked during a legislative or administrative inquiry, we do not believe it is an appropriate line of inquiry in connection with a grand jury investigation, absent some highly unusual circumstances, absent here.
 
 
 36
 Appellant Donaldson urges that her civil contempt commitment must be reversed because she was entitled to assert the husband-wife privilege in refusing to answer grand jury questions.
 
 
 37
 The basic principles may be briefly stated. The federal courts recognize that confidential communications between husband and wife are privileged. Wolfle v. United States, 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617 (1934). This privilege may be exercised by a witness called to testify before a grand jury. Blau v. United States, 340 U.S. 332, 333, 71 S.Ct. 301, 95 L.Ed. 306 (1951). As established in Blau, this privilege includes within its protection information obtained by the witness from his or her spouse, providing the information was privately conveyed. Marital communications are presumptively confidential. It is therefore necessary for the party seeking to avoid the privilege to overcome the presumption. Blau, at 333, 71 S.Ct. 301.
 
 
 38
 At the Donaldson contempt hearing the court reporter quoted six questions which she had refused to answer. All of these questions were so framed as to call only for information within her personal knowledge as distinguished from information imparted to her by others. Yet she claimed the marital privilege with regard to each.[8] In our opinion, Donaldson's marital privilege was not infringed by any of the questions which were testified to in the contempt proceeding.
 
 
 39
 The federal courts also bar a husband or wife from testifying against his or her spouse, unless both consent, with exceptions not here relevant. Hawkins v. United States, 358 U.S. 74, 78-79, 79 S. Ct. 136, 3 L.Ed.2d 125. This is a rule of exclusion. While Donaldson's "marital privilege" claim was imprecise we believe that, in view of the expedited nature of the contempt proceeding, it should be accepted as sufficiently presenting the question.
 
 
 40
 Three of the questions asked of Donaldson, quoted in the margin, may have called for answers which would be "against" her husband, within the meaning of this rule of exclusion.[9] If they were the only questions which she refused to answer, her civil contempt adjudication and commitment could not stand.[10] But the other questions concerning which the reporter testified, summarized in note 8, are not within the ambit of this exclusionary rule. For this reason, the exclusionary rule does not call for reversal.
 
 
 41
 Appellants present other arguments, all of which we have examined. We find them without sufficient merit to warrant discussion. For the most part, they amount to a generalized attack upon the grand jury system as it exists today and raise issues which have long since been set at rest by federal court decisions.
 
 
 42
 The adjudication of civil contempt, and commitments thereunder, are affirmed. The order of December 23, 1970, ordering the immediate release of appellants on their own recognizance or, in the discretion of the district court, into the custody of one of their attorneys, pending disposition of these appeals, has now expired by its own terms. The mandate shall issue forthwith.
 
 
 
 Notes:
 
 
 [1]
 Violations of 18 U.S.C. § 2101 (interstate travel to organize, promote and encourage a riot), 18 U.S.C. § 231(a) (2) (interstate transportation of explosives or firearms), 18 U.S.C. § 837 (interstate transportation of explosives), 26 U.S.C. § 5861(d) (possession of unregistered destructive devices), and 26 U.S.C. § 5861(j) (interstate transportation of unregistered destructive devices)
 
 
 [2]
 In the case of appellant Scheffler, more than one day's notice was given before the final adjudication of contempt was entered
 
 
 [3]
 
 Date Specified Judge in
 Refused Date Duration Tucson
 to Ordered of Ordering
 Testify Committed Commitment Commitment

Weinberg 12/ 2/70 12/ 2/70 Life of grand jury or until Powell
 March 31, 1971, whichever
 date first occurs, or until
 purged (The grand jury was
 to expire on December 31,
 1970, but was later extended
 to March 31, 1971.)
Scheffler 11/19/70 11/20/70 Life of grand jury (March 31, Goodwin
 1971), or until purged
Donaldson 12/ 3/70 12/ 3/70 Life of grand jury (March 31, Powell
 1971), or until purged
Volpin 11/ 3/70 11/ 3/70 Life of grand jury (March 31, Craig
 1971), or sixty days, whichever
 will come about sooner,
 or until purged
Duncan 12/ 3/70 12/ 3/70 Life of grand jury (March 31, Powell
 1971), or until purged
 
 
 [4]
 We recognize that here, unlikeLicata, there were objections to the conduct of the hearings and motions for continuances. But, having in view the issues appropriate for consideration in such proceedings, we do not believe the district court abused its discretion in overruling these objections and denying the motions for continuance.
 
 
 [5]
 Weinberg was asked to describe her contacts with named individuals in 1969 or 1970, the conversations on those occasions, and to name others who were present. Donaldson was asked to state when and where they saw dynamite, fuses, blasting caps, destructive devices or firearms, who else was present on those occasions, and what was done with those items. Duncan was asked to tell who financed her trip to Cuba in 1969, stating not only who the parties were, but how much money was contributed to her for that trip. Volpin was asked if she were acquainted with a group of twenty-four persons whose names were read to her. As to each of these persons whom she knew, Volpin was asked to state the circumstances of her acquaintance, and to describe her conversations and dealings with them. Volpin was also asked whether she participated in any demonstrations at the University of California at Los Angeles on February 19, 1970
 At the Volpin contempt hearing, after the reporter testified to nine grand jury questions and responses, she waived the reading of the remaining questions and responses, stating that she would refuse to answer any of them. None of the other appellants made such a waiver. We could not find that the court reporter testified to any questions asked of Scheffler, falling in the area now under discussion.
 
 
 [6]
 The self-incrimination objections had been overcome by the granting of immunity
 
 
 [7]
 Scheffler declined to state how long he had lived at 602 Venicia, Venice, California. Volpin refused to state whether she lived at a particular address with any other person. She also refused to state whether she had taken any trips outside the state of California at any time during 1970; whether she was the owner of a 1969 Toyota automobile; whether she participated in any riots or demonstrations in the state of California in February, 1970; and whether she participated in any demonstrations at the University of California at Los Angeles on February, 19, 1970. Duncan declined to tell the grand jury whether she had made the statement that she was going to Cuba to gain experience in building the revolution. Donaldson refused to state where she resides
 
 
 [8]
 Including such questions as where she resided at the time of the grand jury investigation, where she resided at other times in 1969 and 1970, and the address at which she received mail in 1969 or 1970
 
 
 [9]
 These questions were:
 "Q Will you describe for the Grand Jury all of the riots, demonstrations and disorders in which you have attended or participated during 1970, telling the Grand Jury when and where these took place and what activities you engaged in, and who else was present?"
 "Q Mrs. Donaldson, will you describe for the Grand Jury every occasion during 1970, on which you have had in your possession or seen in the possession of any other person any dynamite, fuses, blasting caps, destructive devices, or firearms?"
 "Q Will you tell the Grand Jury when and where you saw dynamite, fuses, blasting caps, destructive devices, or firearms, who else was present on those occasions, and what was done with those items?"
 
 
 [10]
 The questions could be reframed in such manner as not to require appellant Donaldson to disclose whether or not her husband was present or participated
 
 
 
 43
 CHAMBERS, Circuit Judge (concurring and dissenting):
 
 
 44
 I concur in the foregoing opinion with two exceptions:
 
 
 45
 1. In my view, Volpin filed her appeal too late. Thus, I would not reach the merits.
 
 
 46
 2. I am not sure that the Donaldson marital privilege was invaded or about to be invaded.